UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 4:14CR0250 CDP |
| CHAD COLLINS, | ) | |
| Defendant. | ) | |

**MEMORANDUM AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(B). The Defendant filed a motion to Suppress Evidence and Statements and the Government filed a response thereto. An evidentiary hearing was held on February 25, 2014. Based upon the evidence adduced at the hearing on the suppression motions, the undersigned makes the following findings of fact and conclusions of law:

**FINDINGS OF FACT**

Brandon Moles is a Special Agent with the Drug Enforcement Agency ("DEA"). He is the case agent or lead agent on a long-term investigation involving the marijuana trafficking organization of a person named Kyle Kienstra. Kienstra was the leader of this marijuana organization and he was sending multi-hundred pound quantities of marijuana from California to St. Louis, Missouri, and additional cities for distribution. Investigation was long-term and lasted over four years.

1

During the course of the investigation Agent Moles developed a source of information within the organization. The source of information was Greg Gibbar who was directly involved with Mr. Kienstra in the distribution of marijuana, and the collection of proceeds in the St. Louis area. Mr. Gibbar's identity is now known to the defense and he evidently will testify at trial.

Mr. Gibbar was initially arrested in Cape Girardeau, Missouri, on our about September 24, 2013, and agreed to cooperate on that date during the course of the ongoing conspiracy of which Mr. Kienstra was the lead person. Mr. Gibbar's role in the Kienstra organization was that when a shipment of Marijuana arrived in St. Louis, Gibbar would at times provide a rental vehicle to pick up the marijuana and transport it to distributors, usually in one hundred pound quantities and then he was also responsible for picking up the marijuana proceeds from theses distributors. On September 24, 2013, pursuant to his duties in the organization, Gibbar had a telephone conversation with Mr. Kienstra. This conversation was tape recorded by DEA. In the conversation Mr. Kienstra instructed Gibbar to pick up money from two individuals. One person named Arnold at a location he described as "movie boys" and another from an individual named Lenny. He stated that he should pick up eighty-thousand dollars from Arnold. Arnold was not a real name, and it was a nickname used by Gibbar to hide the true identity of "Arnold". Gibbar was well aware that "movie boys" was on Gene Lee Drive in St. Louis County, Missouri. He had either delivered marijuana to Arnold or picked up proceeds from Arnold at this location on three to five occasions prior to September 24th direction from Kienstra to pick up the eighty-thousand dollars from Arnold.

Armed with this information an undercover DEA agent drove Gibbar to the address on Gene Lee. The agent did not know the location of the address, and followed Gibbar's directions to the house. Gibbar was equipped with a recording device, and was evidently searched to determine that he had no money on him. When they reached the house at Gibbar's direction, Gibbar got out of the undercover vehicle, went to the door and knocked. He was admitted to the house by third parties and eventually talked to Arnold. The conversation took about ten minutes, and Arnold told Gibbar what kind of marijuana he wanted delivered on the next occasion. Arnold then gave Gibbar a bag containing eighty-thousand dollars. Gibbar came out of the house and went directly to the undercover vehicle. He was taken to a safe location, where the agents searched him and the bag, finding eighty-thousand dollars in cash in the bag. Gibbar told the agents that the received the eighty-thousand dollars from Arnold, and the tape evidently confirmed this. Gibbar also pointed out a Chrysler 300 automobile which he said Collins often drives. In checking the license plate on the vehicle, it was registered to Cliff Collins in Bloomsdale, Missouri.

It also should be noted that prior to the September 24th meeting with Arnold, Gibbar had on at least fifteen prior occasions either delivered marijuana to or picked up proceeds from Arnold. This occurred at various locations in the St. Louis area, including at an apartment complex on Butler Hill Road, and a residence on Murdoch in the City of St. Louis. During each of these occasions, Gibbar was in face-to-face encounters with Arnold, involved in criminal transactions. In summary, although they were purposely kept from knowing each other's real name Arnold and Gibbar had dealt with each other on multiple occasions over long

periods of time and were well aware of who each other was and where they lived. After the last transaction, Moles and the other agents attempted to identify Arnold. They were aware from Gibbar that Arnold had utilized a house on Murdoch to accept delivery of marijuana from Gibbar and to give him payments. For a time, Arnold was confined to this house because he was involved in a serious motorcycle accident. Gibbar directed agents to the house on Murdoch and went with them. At the house they observed the same Chrysler 300 parked at the location, along with a Cadillac Escalade behind the structure backed into a garage area. They could not find a license plate on the Escalade.

Moles was also aware that Kienstra had contacted Arnold some time around September 24th. He began to check the calls from Kienstra's cellular telephone to individuals who matched Arnold's description. Gibbar had described Arnold as a white male late twenties to early thirties and clean cut looking. Kienstra had multiple cellular telephones some of which were registered to him or individuals associated with him. Others Moles speculated were "burner" telephones, ones that could not be traced. When Moles would find a likely call made by Kienstra to an individual matching the description he would get a copy of the Department of Revenue photograph and take it to Gibbar and show it to him.. He did this on at least ten occasions with Gibbar stating each time that the photograph was not Arnold. Somewhere around the 10th or 15th likely suspect photograph that was shown to Gibbar, Gibbar looked at the photograph and immediately said "that's Arnold". He did this without hesitation, and was very confident that it was in fact Arnold. The photograph was of Defendant, Chad Collins.

In checking public records on Chad Collins, he determined that Collins had lived or was

living at an address on Lynch Street in the City of St. Louis. Moles and other agents conducted surveillance of this location, and observed the same Chrysler 300 that had been observed on Gene lee and Murdoch to be at that location. It had the same plates on the vehicle. In addition, they observed the Cadillac Escalade at the Lynch Street address. It also had at least one plate that was exactly the same as the Chrysler 300. During the surveillance, they observed Chad collins driving the Cadillac Escalade. In addition, they determined that Chad collins had a motorcycle license.

## APPLICABLE LAW

In *Perry v. New Hampshire*, 132 S.Ct. 716, 724 (2012), the United States Supreme Court reaffirmed the propriety of a two-part test to determine whether the Due Process Clause requires suppression of an eyewitness identification allegedly tainted by police arrangement. The Court explained that "due process concerns arise when law enforcement officers use an identification procedure that is both suggestive and unnecessary" and noted that "[e]ven when the police use such a procedure . . ., suppression of the resulting identification is not the inevitable consequence. *Id*. (citing *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977); *Neil v. Biggers*, 409 U.S. 188, 199 (1972). Rather, the second step of the undue suggestiveness framework requires an inquiry into "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil*, 409 U.S. at 199. If an identification resulting from an unduly suggestive procedure is deemed reliable, it is admissible, "[n]otwithstanding the improper procedure" used by the police. *Perry*, 132 S.Ct. At 725; see also *United States v. Harris*, 636 F.3d 1023, 1026 (8th Cir. 2011)

5

(holding that "'[c]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification'") (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).

In *Howard v. Warden, Lebanon Correctional Inst.*, 519 Fed. App'x 360, 366 (6th Cir. 2013), the appellate court explained that when determining whether to suppress an eyewitness identification, courts should not consider the reliability of eyewitness evidence, i.e., engage in part two of the test, unless the defendant satisfies the requirement of part one by proving that the police employed an unduly suggestive identification procedure. *Id*. (Citing *Perry*, 132 S.Ct. At 725-26) (internal citation omitted). Unless there is a showing that law enforcement employed an unduly suggestive procedure to obtain identification , the unreliability of the identification alone will not preclude its use as evidence at trial. Instead, such lack of reliability should be exposed through the rigors of cross-examination. *Howard*, 519 Fed. App'x at 366-67. As the Court in *Perry* added, "[w]hen no improper law enforcement activity is involved," reliability is better tested with tools such as "the presence of counsel at post indictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.*"* *Perry*, 132 S.Ct. At 721; see also *United States v. Rivera-Rivera*, 555 F.3d 277, 282 (1st Cir 2009) (holding that "[a]lthough introduction of 'impermissively suggestive' identification evidence may violate the Due Process Clause, we

have stated repeatedly that identification evidence should be withheld from the jury only in extraordinary cases.") (internal quotations omitted)).

Due process challenges to in-court identifications require courts to determine (1) whether the challenged confrontation between the witness and suspect were impermissibly suggestive, and (2) if so, whether under the totality of the circumstances of the case, the suggestive confrontation created "a very substantial likelihood of irreparable misidentification." *Graham v. Solem*, 728 F.2d at 1541 (8th Cir. 1984) (quoting *Simmons*, 390 U.S. at 384 and *Brathwaite*, 432 U.S. at 116.

The first inquiry, relating to unnecessary suggestiveness, also "contains two component parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures." *United States v. Brownlee*, 454 F.3d 131, 137 (3rd Cir. 2006) (citations omitted). In a "show-up" procedure "like that initially employed by Agent Moles, a single individual arguable fitting a witness's description is presented to that witness for identification." *Id.*, 454 F.3d 131, 138 (3rd Cir. 2006). Although not per se impermissible such procedures are viewed "with suspicion." See *Braithwaite*, 432 U.S. at 109.

The second inquiry for purposes of the due process analysis is whether, regardless of its tendency to suggestiveness, the identification is reliable. *Graham*, 728 F.2d at 1541 (stating that when "[p]ared to its essence, the second inquiry is whether the identification is reliable")(internal citations omitted)). The factors relevant to reliability are (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention,

7

(3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Id*. At 1542-1547 (citing *Brathwaite*, 432 U.S. at 199-200).

Furthermore, where other indicia of reliability are present, courts have deemed identifications reliable even where significant time has elapsed between the incident and identification. See, e.g., *United States v. West*, 523 Fed. App'x 602, 605 (7th Cir. 2012) (four years); *United States v. Peterson*, 411 Fed. App'x 857, 865 (6th Cir. 2011) (one year and eight months); *United States v. Clark*, 319 Fed. App'x 395, 402-03 (6th Cir. 2009) (five years); *United States v. Henderson*, 320 F.3d 92, 100, 101 (1st Cir. 2003)(two and one-half years); *United States v. Flores-Rivera*, 56 F.3d 319, 331 (1st Cir. 1995) (seven years)

## **Discussion**

With respect to Gibbar's identification of Collins after he received and viewed at least ten to fifteen department of revenue photographs of various individuals the Court questions the Defendant's assertion that this process should be characterized as a "show-up" and therefore deemed suggestive. See *United States v. Patterson,* 20 F.3d 801 (8th Cir. 1994). Here Agent Moles attempted to identify Arnold from the description given by Gibbar and from matching telephone calls from Kienstra to a person likely to be Arnold. While conducting these inquiries, he showed Gibbar at least ten to fifteen Department of Revenue photographs before Gibbar positively and unhesitatingly identified Arnold as Chad Collins. Therefore, the undersigned believes that the identification procedure although it involved a single photograph, at the end, was not a "show-up" procedure and was fair. However, even if the undersigned

assumes that the detective's use of the single photograph was a "show-up", the undersigned is satisfied that under the second prong of the analysis, Gibbar's identification was without question reliable and does not give rise to a substantial likelihood of irreparable misidentification. See *Perry*, 132 S.Ct. at 725-26.

Although the undersigned concludes that the identification procedure used here was not impermissibly suggestive, the undersigned will out of an abundance of caution consider the second prong of the due process analysis and assess the reliability of the identifications. In this regard the undersigned has considered (1) the witnesses opportunity to use defendant at the time of the incident; (2) the witnesses degree of attention at the time of the incident; (3) the accuracy of the witnesses description of the Defendant prior to the identification; (4) the witnesses level of certainty when identifying the defendant; and, (5) the length of time that elapsed between the crime and the confrontation. See *Neil*, 409 U.S. at 199-200; *United States v. Hadley*, 671 F.2d 1112, 1115-16 (8th Cir. 1982). Upon consideration of these factors and the totality of the circumstances the undersigned concludes that the identification at issue was sufficiently reliable to allow its presentation to a jury.

First, in light of the authorities noted above the undersigned concludes that the two month lapse in time between the incident and the photo identification does not render the identifications unreliable. Court's have found significantly longer lapses of time to be acceptable. See *West*, 523 Fed. App'x at 605 (4 years). Moreover, the lapse of time is only one factor in the analysis in this case. The lapse of time is heavily outweighed by the application of the remaining factors. For example, Gibbar viewed the Defendant for over ten

minutes during the September 24th encounter where he picked up eighty-thousand dollars in cash proceeds from him. More importantly, Gibbar had dealt with Arnold over at least a one year period of time and had met with him on fifteen separate occasions at areas all around the city. During these occasions he transacted important business with Arnold delivering significant amounts of marijuana from him and collecting large amounts of cash. It is apparent that they knew each other well, as well as a business man and his customer would know each after doing business over along period of time. There would appear to be little doubt that only two months later, "Gibbar would readily recognize a photograph of Arnold." All of the other factors in short, favor allowing the identification. Gibbar accurately described Arnold as being a white male, in the right age group and clean cut looking, he was absolutely certain of the identification when he observed the photograph, and his degree of attention at the time of the incident was obviously high. In addition, the undersigned may also consider other evidence of the Defendant's involvement in the criminal activity which corroborates his identification. This would include viewing the Chrysler 300 at the Gene Lee address, the Murdoch address, and the Lynch Street address; observing the Defendant driving the Escalade automobile using the plates from the Chrysler 300 automobile; the registration of the license plates to a Cliff Collins; the fact that defendant possessed a motorcycle license and allegedly had been injured in a motorcycle accident; the fact that everything that Gibbar told them about Arnold was corroborated, including the vehicles present at the Gene Lee, Murdoch, and the Lynch Street address; and finally, the fact that Collins was in contact with Kienstra, the top of the marijuana organization on more than one occasion. Because of all of the above the undersigned

concludes considering the totality of the circumstances the identification by Gibbar was reliable and should not be suppressed.

**<u>Conclusion</u>**

In accordance with the analysis set forth above the undersigned finds that the identification derived from Mr. Gibbar should not be suppressed. It is hereby recommended that the motion to suppress identification evidence be denied.

Further, the parties are advised they have fourteen (14) days, in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions or fact. Thompson v. Nix, 897 F.2d 357 (8th Cir. 1990).

          /s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this <u>11th</u> day of March, 2015.